1        UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF NEW YORK
2

3    -------------------------------------------X
                                               :
4    S.I. CHIROPRACTIC ASSOCIATES, PLLC, et al, :
                                               :09-CV-2276
5             Plaintiffs,                      :
           v.                                  :
6                                              :November 30, 2010
     AETNA, INC., et al,                       :Brooklyn, New York
7                                              :
              Defendants.                      :
8    -------------------------------------------X

9

10        TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
             BEFORE THE HONORABLE CAROL B. AMON
11                UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   For the Plaintiff:        JOHN TRACY, ESQ.

14

15   For the Defendant:        DIANA COSTANTINO GOMPRECHT, ESQ.

16

17

18

     Court Transcriber:        MARY GRECO
19                             TypeWrite Word Processing Service
                               211 N. Milton Road
20                             Saratoga Springs, NY 12866

21

22

23

24

25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service

1          THE CLERK:  Staten Island Chiropractic Associates v.

2   Aetna, Incorporated, et al, 09-CV-2276.  Counsel?

3          THE COURT:  All right.  We have for the plaintiff

4   John Tracy?

5          MR. TRACY:  Yes, Your Honor.

6          THE COURT:  All right.  Good morning.

7          MR. TRACY:  Good morning, Your Honor.

8          THE COURT:  And for the defendants, Ms. Gomprecht?

9   How do you pronounce your name?

10          MS. GOMPRECHT:  Gomprecht.

11          THE COURT:  Gomprecht.  Okay.

12          MS. GOMPRECHT:  Good morning, Your Honor.

13          THE COURT:  Good morning.  This case had originally

14   been on some time ago for a pre-motion conference and I had

15   recommended at the time that the parties exchange some

16   documents and see if perhaps there was some basis for

17   resolution of the matter.  Mr. Tracy, has that been done?

18          MR. TRACY:  Yes, Judge.  We exchanged actually a box

19   of many hundreds of claim information and explanations about

20   the forms and so forth with Aetna.  We sent it to them.  I

21   received a letter a few weeks ago that they reviewed it by

22   their claims personnel.  Apparently they put a lot of time and

23   effort into actually reviewing all the documentation.  We

24   still are immensely far apart.

25          After reviewing all the documentation, Mr. Kelly

3

1   indicated, and Ms. Gomprecht has confirmed that they believe

2   that there's no basis for any recovery by the plaintiffs, and

3   therefore, are not in a position to make any offers and it

4   doesn't appear that there's any chance of resolving this case

5   certainly before motion practice and some discovery has been

6   done in the case.

7         THE COURT:  Well, what was the result of the review

8   of the documents?

9         MS. GOMPRECHT:  Yes, thank you, Your Honor.  We,

10  just to give you a little bit of background, we asked Mr.

11  Tracy to choose ten patients of the I believe nearly 70

12  patients that are relevant in this litigation.  He sent us

13  files for ten patients of his choosing which had more than 750

14  claims attached to them.  We then had claims -- so each visit

15  or each procedure is one claim.  So then we then asked Aetna

16  to once again review all 750 plus claims which took I believe

17  two individuals nearly two months to do and determine once

18  again why these claims were denied.  We created a large

19  spreadsheet to make it easy for plaintiffs to review the data

20  and we offered to meet with Mr. Tracy and bring someone from

21  Aetna, probably a claims person, to sit down with plaintiffs

22  and explain the process to see if we could resolve this

23  matter.

24         Plaintiffs have rejected our proposal to meet with

25  them and have instead essentially demanded that we make an

4

1    offer to settle which we are not prepared to do until we sit

2    down and talk with them so we can work through the paperwork

3    and explain why we don't think the case has any merit.  And if

4    they have a different opinion, we'd like to discuss that at

5    length.  But at this point, we're not in a position to offer

6    any sum of money because we have not determined that any of

7    the claims were wrongfully denied.

8            THE COURT:  What was the basis for denying the

9    claim?

10           MS. GOMPRECHT:  They vary.  Aetna strictly follows

11   the plan.  So some of the procedures were duplicative, so the

12   plan does not allow for duplicative procedures.  Sometimes the

13   plan clearly states that a patient is only allowed to have 12

14   such procedures in a year and the 12 number is exceeded.

15   Sometimes the documents submitted by the chiropractor is

16   insufficient, so we ask for followup.  If that information is

17   not received, it's denied for that reason.  You know, there's

18   a wide range and we provide the reasons when we communicate

19   with the patients.

20           THE COURT:  But it's your review of all of these

21   claims was not that the work in your view wasn't done, it was

22   just that it wasn't covered work?

23           MS. GOMPRECHT:  In some instances there is

24   insufficient documentation to show that the work was done.

25   That's correct, Your Honor.  In others, the work might be done

1    but the plan doesn't cover the procedure or it exceeds the

2    number of procedures of that type that are allowed pursuant to

3    the plan.  In other instances, it's determined not medically

4    necessary.  So you can imagine the reasons are wide ranging

5    and we provide those reasons to --

6         THE COURT:  So you reviewed 750 claims that had

7    previously --

8         MS. GOMPRECHT:  Again.

9         THE COURT:  -- been rejected?

10        MS. GOMPRECHT:  Yes.  These claims had been

11   processed.  We looked at them --

12        THE COURT:  And not one of the 750 was found to be a

13   mistake or maybe a legitimate claim?

14        MS. GOMPRECHT:  For some of the 750 we were unable

15   to find the claims so we -- and I believe Mr. Kelly attached

16   the chart to that effect in the letter.  We haven't heard back

17   on those.  The others have been confirmed proper denials and

18   appeals process expired, things of that nature, which we

19   outlined in this chart which it's 750 claims that were looked

20   at again for this, pursuant to Your Honor's instructions last

21   time.

22        THE COURT:  And all 750 you found were in your view

23   and upon review again appropriately denied?

24        MS. GOMPRECHT:  Correct.  We're still willing to

25   meet.  I mean we've spoken with Aetna and they would be

6

1   willing to even mediate with plaintiffs to see if we could

2   somehow resolve this case.  You know, I think the next step if

3   that doesn't occur is to set down a motion schedule which I

4   know Your Honor has discussed in the past with Aetna.

5           THE COURT:  You want to refer -- the parties want to

6   refer the case to mediation?

7           MR. TRACY:  Can I speak about that, Judge?

8           THE COURT:  Yes.

9           MR. TRACY:  You hit it right on the head, Judge.

10  There's not one of the 750 claims, and that's only about 25%,

11  not one of the claims ever performed by these chiropractors

12  who have been doing this for 20 to 30 years and who have been

13  paid by Aetna in the past concerning all the claims, who

14  submit all the documentation with the claims, not one has been

15  paid.  And that goes for every single claimant that is --

16          THE COURT:  Well, are you saying though that Aetna

17  hasn't paid, for a period of time Aetna has not paid a single

18  claim for these chiropractors or that they've just denied a

19  lot of them?

20          MR. TRACY:  No, no.  Virtually all of them have been

21  denied.  All of the -- what happens is all of the claims,

22  these chiropractors are singled out and all of their claims

23  are put into review, nonpayment, and they're never paid.  Some

24  of them actually do get through, a very small percentage.

25  Probably less than 5% are paid.  Everything else is

7

1  unilaterally denied for various different reasons, none of

2  which meet the ERISA requirements.

3          THE COURT:  What do you mean meet the ERISA

4  requirements?

5          MR. TRACY:  When you do deny a claim, and these are

6  ERISA covered claims, they need to have specific reasons for

7  the denials.  Those are never done.  Specific requirements

8  for, such as a description of the material and information

9  necessary to perfect an appeal or perfect a claim.  That's

10  never included in the claims.  Appeals process -- actually, of

11  the 750 claims, perhaps 30 of them actually do have the

12  appeals procedures on them, but the other hundreds of them

13  don't.  And these are all ERISA violations.  And it's just

14  really essentially, Judge, it's just a unilateral refusal to

15  pay these chiropractors' claims.  They're legitimate claims

16  and it's obvious that we're running up against a stone wall.

17          There's no chance of resolving this, Judge.  I don't

18  think mediation at this stage is really going to help.

19          MS. GOMPRECHT:  Your Honor, I just want to note that

20  you did hit on a very important point.  The 750 plus claims

21  that we looked at were only those that had been denied.  So

22  just to be clear, we confirmed --

23          THE COURT:  Well, how many of them were granted?

24          MS. GOMPRECHT:  What we looked at was Mr. Tracy sent

25  us a list of all the denied claims and that's what we worked

8

1    off of.  The others, and I don't know how many others there
2    were, were paid.  So we're only dealing with the ones that
3    were denied for whatever reason at Aetna.
4        I also want to note that the explanation of benefits
5    forms does have the appeals process on them.  We're not
6    required under ERISA to supply the appeals process to the
7    actual chiropractor, although there were -
8        THE COURT:  Well, he's taking the assignment of
9    claims from the patients though I believe.
10        MS. GOMPRECHT:  Yes.  So he needs to go to his
11    patients and prove to us that they weren't given an appeals, a
12    description of the appeals process which we've asked him, you
13    know, show us, show us what these patients have gotten.  If
14    you can show us that we didn't provide them the appeals
15    process -- which is not what we're finding at Aetna because
16    that is their policy, they send out an explanation of benefits
17    form when the claims are processed.  The form has the appeals
18    process on the back of it.  So we haven't seen anything from
19    plaintiffs.  We're willing to look at that.  If that is in
20    fact what exists, we don't believe it to be true, but if
21    that's what's been happening and he can demonstrate that to
22    us, we will look at that.
23        This is why we thought a meeting made sense.  Mr.
24    Tracy, you know, as he just repeated, doesn't want to do that
25    for some reason, but we thought rather than go through

9

1  expensive time consuming and costly motion practice, which is

2  the next step, that maybe the parties could sit down and have

3  a conversation perhaps with a mediator.

4           THE COURT:  I don't see why that's not something

5  that ought to at least be tried.  I mean have you sat down --

6  you haven't sat down and had her explain or counsel for Aetna

7  explain to you why when reviewing this they still think it's

8  not a proper claim?  I mean it's one thing -- I mean if they

9  say that someone exceeded the number of treatments, why do you

10  have reason to think that's incorrect?

11           MR. TRACY:  That's never put in any of the

12  explanations.  It was never put in the denials.  That's simply

13  not true.  All they do is put see explanation below and

14  there's no explanation below.  It's preposterous.  We gave

15  them copies of the explanation of benefits form that we

16  received with the actual blank pages on them.  They say they

17  send them out to the patients.  Well, we represent the

18  patients and they deny receiving it.  We have assignments from

19  the patients.  The patients indicate the same.  It doesn't

20  make any sense that they would send one explanation of

21  benefits to the patient and a different one to the doctor and

22  --

23           THE COURT:  So the ones that you turned over are the

24  explanation of benefits that were sent to the doctor?

25           MR. TRACY:  Yes.

10

1          THE COURT:  And they have no statement of why the

2     claim was denied?

3          MR. TRACY:  They don't have a specific reason, yes,

4     correct.

5          THE COURT:  So it doesn't say something like

6     exceeded the number of treatments?

7          MR. TRACY:  Correct.

8          THE COURT:  Well, what does it say?

9          MR. TRACY:  It'll say not medically necessary or see

10    explanation below and there is no explanation below.  Or it

11    will say we need further information even though they have all

12    the information because the doctor automatically sends them

13    all of the information required.  All of their medical records

14    necessary to make a medically necessary determination go with

15    the claim form.  They do it automatically for Aetna because

16    they know that they're going to run into this type of --

17         THE COURT:  Well, have you shown counsel the copy of

18    the benefit forms you've gotten --

19         MR. TRACY:  Yes, yes.

20         THE COURT:  -- that don't have an explanation?

21         MR. TRACY:  Yes.  That was part of the discovery

22    disclosure that we did pre-action before that Judge Pohorelsky

23    had instructed us to do.  We did that.  And then they say

24    well, you know, those are the doctor's EOBs.  We send

25    different ones to the patients.  That doesn't make any sense

11

1   and our patients deny it.

2           THE COURT:  Is that the position that you send

3   different ones to the patients?

4           MS. GOMPRECHT:  I believe there may be different

5   forms, Your Honor, but when he says there are no reasons for

6   the denial, many of the denials are not medically necessary

7   and that includes what I just explained to the Court which are

8   over-utilizations which is you're having a procedure done

9   three times in a month that's only allowed one time a month,

10  or you're exceeding the 12 annual limit.

11          And then there is an appeals process which every

12  patient receives when he or she receives the explanation of

13  benefits.  That appeals process is very clear.  We've shared

14  that with Mr. Tracy.  There's a certain amount of time to

15  appeal.  I mean this is not a foreign thing.  Most plans work

16  this way.  Once that time lapses, those claims are gone,

17  they're finished at Aetna.  This is the spreadsheet that we

18  sent over to Mr. Tracy outlining what the reasons were, not

19  medically necessary, whether documents were missing.  There

20  were certain claims where we received the medical files and

21  there was either insufficient data or nothing there to prove

22  that a visit occurred or that a certain procedure was done on

23  a patient.  Now, Aetna is not going to pay those, nor should

24  they, and the plan specifically states that they should not.

25          THE COURT:  What do you have to lose by -- are you

12

1    going to share Aetna's files on these claims?

2          MS. GOMPRECHT:  We did.  We sent him the spreadsheet

3    that Aetna --

4          THE COURT:  No, the files that you go back to where

5    you say for this claim we don't have -- in other words, an

6    example of one where the paperwork is insufficient.

7          MS. GOMPRECHT:  Sure.  I mean the records that Aetna

8    has, you know, we can talk to the claims people.  We were

9    going to bring a claims person to the meeting and hopefully

10   talk ahead of time to see what kind of documentation would

11   make the meeting meaningful and successful.  But many of the

12   records were exactly the same as what was sent by plaintiff.

13   So they're disputing what happened here but we're following a

14   plan that dictates what Aetna must do, what they can pay and

15   what they cannot pay under the plan at issue.

16         We're still willing to sit and talk and see if we

17   can resolve it, but we're not there yet.

18         THE COURT:  Well, not medically necessary isn't much

19   of an explanation.  Not medically necessary can mean three or

20   four different things.  That's not a real helpful statement to

21   have someone understand why a claim is being turned down.

22         MS. GOMPRECHT:  I mean I'm sure we can sit down and

23   have more details provided for a sampling, like what we did

24   here for the ten that we reviewed.  You know, we had ten files

25   --

13

1       THE COURT:  And you have your files there that you

2   can show to them?

3       MS. GOMPRECHT:  I believe a lot of what Aetna does

4   is electronic, so I'd have -- you know, this was all done in-

5   house internally with the claims people who have a certain

6   process.  They sometimes involve a medical person to determine

7   whether something is necessary or not.  So there's a process

8   in place.  I'm not sure what's in paper and what's practice.

9   The plans obviously are at issue too.

10      But we would certainly do our best to make available

11  anything that would help the meeting be successful.

12      THE COURT:  I don't understand what you've got to

13  lose by going to a meeting.

14      MR. TRACY:  Other than more time.  I have no problem

15  with going to any meeting but really, Your Honor, they're not

16  going to be paying any of these claims, not voluntarily.  I

17  mean really it's just questions of fact.  Did you send that?

18  Did you receive that?  I know we'll have sworn testimony that

19  this is what we received, blank documents.

20      As she indicated, they indicate denials for not

21  medically necessary, but that doesn't satisfy the ERISA

22  requirements.  Every claim where they put that statement in

23  violates the ERISA requirements for a denial.

24      THE COURT:  Which ERISA requirement?

25      MR. TRACY:  The ERISA requirements, I cited the

14

1  section in our papers and I can cite that now too.  It's 29

2  CFR Section 2560.503-1G.

3          THE COURT:  Oh, that provision.  I remember that

4  one.

5          MR. TRACY:  I know.

6          THE COURT:  Or maybe it was F.  I forget.

7          MR. TRACY:  Yeah, Judge, but the point is there are

8  five specific requirements that denials are supposed to have.

9  Some of the denials have some of them.  Some of the denials

10 have other, but none of the denials have all of the

11 requirements.

12         THE COURT:  Were any of these appealed?

13         MR. TRACY:  Yes, and some of the appeals are still

14 pending.  None have been paid.  These doctors have not been

15 paid for any of their procedures.

16         MS. GOMPRECHT:  Well, that's not true.  We're just

17 talking about the denied claims.

18         MR. TRACY:  That is true, that is true.  They

19 haven't been paid.

20         MS. GOMPRECHT:  The only claims at issue are those

21 that have not been paid, but I don't --

22         THE COURT:  Well, apparently --

23         MR. TRACY:  Those are all of them.

24         THE COURT:  -- those are -- I guess counsel's point

25 is those are essentially all of the claims, that there were

15

1  only a few -- some have been paid.  How many have been paid

2  out of --

3           MR. TRACY:  The only reason that they paid, Judge,

4  we believe is if a new chiropractor is hired by the practice,

5  that chiropractor is not on their list, so they paid some of

6  those claims.  But eventually when they discover that they're

7  with the Staten Island Chiropractic Group, there's about four

8  chiropractors, two partners, and they have two or three new

9  chiropractors --

10          THE COURT:  So what statement are you making?  What

11 period of time does the lawsuit cover?

12          MR. TRACY:  This is for March of 2006.  And since

13 then --

14          THE COURT:  To what day?

15          MR. TRACY:  To the present.

16          THE COURT:  So from March of 2006 to the present the

17 original partners of this chiropractic practice have not been

18 paid a penny by Aetna?

19          MR. TRACY:  Less than 5% of the claims.

20          THE COURT:  And are some of these like a new person

21 walks in the door and it's not someone who's been there

22 repeatedly or anything like that?  I mean it's like a new

23 person comes in with a prescription or something and --

24          MR. TRACY:  Well, part of our claim is very few new

25 Aetna patients do come because they ask do you take Aetna as a

16

1   carrier and they explain that yes they do but they're not

2   being paid on them.  They are getting less and less -- they

3   have very few new Aetna patients.

4           THE COURT:  Are the patients responsible for the

5   payment if they have Aetna and the doctors are on Aetna's

6   plan?  Do patients have to pay if Aetna doesn't pay?

7           MR. TRACY:  Yes.  They're ultimately responsible but

8   in order to treat the patients, in order to have them, they

9   accept assignments.  And Aetna's policy provides and tells the

10  patients that yes you can go out of network.  I think that's

11  one of the bases here for the denial.  These are out of

12  network chiropractors.  The plans tell the patients yes, in

13  our plan you can go out of network.

14          THE COURT:  Oh, these are out of network?

15          MR. TRACY:  And that's the reason they're actually

16  not paid.

17          MS. GOMPRECHT:  Your Honor, we obviously dispute

18  that.  I mean Mr. Tracy is making statements that he has no

19  basis for making, the fact that we're not paying these.

20          It's our position that these are not being paid

21  because the proper paperwork is not submitted as explained

22  when we send the explanation of benefits, they exceed the

23  number of procedures allowed, it's not medically necessary.

24  There's a whole process in place.  Aetna --

25          THE COURT:  It does seem odd that they're denying

17

1   almost all but 5% of the claims.  I mean if they were not

2   proper paperwork being submitted, wouldn't that be something

3   somebody from the office would call up and talk to them about

4   and they'd work that out?

5            MS. GOMPRECHT:  Your Honor, we send out the

6   necessary paperwork to request that information.  We send it

7   to the patient because our contract is with the patient.  If

8   they never send that information, Aetna cannot and will not

9   pay it.  The plan provides for that.

10           Mr. Tracy has not shown us any evidence that such

11  information was sent to us and then we just denied it.  We

12  haven't seen that as far as I know.  You know, but not

13  everything is denied for the same reason.  I don't know if --

14  you know, Mr. Tracy has said 5% of the claims --

15           THE COURT:  If you're out of network, you don't have

16  Aetna as a plan.

17           MR. TRACY:  Yes.  According to the Aetna plan, you

18  are allowed to go out of network and they will pay according

19  to their plan.  They say --

20           THE COURT:  They pay --

21           MR. TRACY:  They will pay the out of network doctor

22  --

23           THE COURT:  Oh, okay.

24           MR. TRACY:  -- by assignment.  [Cell phone ringing.]

25  I apologize, Judge.

1          THE COURT:  It's not a thing where the patient has

2    to pay up front and then submit it to their insurance company?

3          MR. TRACY:  Not at all.

4          MS. GOMPRECHT:  I think it depends on the plan but

5    if Mr. Tracy says no -- I apologize, I don't know the answer

6    to that.  But I mean again, this is why --

7          THE COURT:  How much money is involved?  I asked

8    that question before.  I don't remember.

9          MR. TRACY:  The claims alone are in excess of

10   $100,000.00.  That's more than what we're claiming here too.

11   I mean we're also claiming the ERISA penalties and we're also

12   claiming actually the loss of business to the doctors.  We

13   think it's a significant claim.

14         THE COURT:  Loss of business?

15         MR. TRACY:  Essentially because they won't pay,

16   Aetna won't pay them, they're actually losing numerous

17   potential patients.  It's a very driving practice.  They have

18   grown.  Every other carrier that they take for the patients

19   except for Aetna --

20         THE COURT:  So other carriers have not had problems?

21         MR. TRACY:  Correct.

22         MS. GOMPRECHT:  Then they haven't been damaged

23   because they're able to see these other patients if what you

24   say is true.  There are only so many hours in a day.

25         THE COURT:  Well, do they take Blue Cross/Blue

19

1   Shield patients and --

2           MR. TRACY:  HIP, GHI, yes.  They take most insurance

3   plans.

4           THE COURT:  And you've had no problems with Blue

5   Cross turning down claims?

6           MR. TRACY:  No.

7           THE COURT:  It does seem odd.  Well, what motions do

8   the parties want to make here?

9           MS. GOMPRECHT:  Your Honor, I think in the previous

10  letter to you Mr. Kelly outlined a partial motion for summary

11  judgment that we would like a briefing schedule on if the

12  parties decide not to mediate at this time.

13          THE COURT:  Well, here's what I'm going to do.  I'm

14  going to direct that you -- because I think it will be helpful

15  one way or the other.  I don't think it's a waste of anybody's

16  time because if nothing else, plaintiffs will end up getting

17  some discovery on what the case is about.  So I'm going to

18  direct that before the motions be filed that you have this

19  meeting and you sit down with the claims people and have them

20  explain what the problem is.  You know, plaintiffs can bring

21  some of their documentation.  You know, have it go both ways.

22          MS. GOMPRECHT:  Your Honor, would the Court be

23  willing to assign a mediator to assist in the process?  I

24  think the parties have a certain level of mistrust between

25  them or at least that's what's perceived.  Perhaps a neutral

20

1   person overseeing a process would be helpful.

2            THE COURT:  What I'm going to ask you to do is -- I

3   think the Magistrates are better at arranging those kind of

4   meetings.  Have you been before the Magistrate at all?

5            MR. TRACY:  Yes, for some disclosure, some pre-

6   action disclosure.

7            THE COURT:  All right.  Then I'm going to ask you to

8   see the Magistrate, to call and schedule a conference with the

9   Magistrate.  Since this is defendant's idea, let me ask you to

10  do that and tell him that you talked with the Court about

11  setting up a mediation and the Court would like to have him

12  help proceed.

13           MS. GOMPRECHT:  Okay.

14           THE COURT:  Then if that's not successful, Ms.

15  Gomprecht, then I mean I'll assume you'll be able to work this

16  out in the next 60 days.  If that's not successful, then

17  either side can write a letter.  You can write a letter

18  renewing your request for a motion schedule.  But call the

19  Magistrate and set up a conference so you can get that going.

20           MS. GOMPRECHT:  Okay.

21           THE COURT:  Okay.  Thank you.

22           MR. TRACY:  Thank you, Judge.

23           MS. GOMPRECHT:  Thank you, Your Honor.

24                      *  *  *  *  *  *

25

21

1        I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5   _____

6                                   Mary Greco

7   Dated:   January 20, 2011

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25